**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

_____

**DONALD KOESTER, JOHN CHASE,**
**EARNEST LEE, and CHARLES McCALEB,**
**a/k/a CHARLES SMITH, individually and on**
**behalf of others similarly situated,**

          **Plaintiffs,**                **Civil Action No. 2:19-cv-02283-SHL**
                                             **JURY DEMANDED**

**v.**

**USAA GENERAL INDEMNITY COMPANY and**
**UNITED SERVICES AUTOMOBILE ASSOCIATION,**

          **Defendants.**

_____

## SECOND AMENDED COMPLAINT

_____

COME NOW Plaintiffs Donald Koester, John Chase, Earnest Lee, and Charles McCaleb a/k/a/ Charles Smith (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, with the written consent of USAA General Indemnity Company pursuant to Fed. R. Civ. P 15(a)(2), and state and allege the following for their Second Amended Complaint against USAA General Indemnity Company and United Services Automobile Association:

### PARTIES, RESIDENCY, JURISDICTION AND VENUE

1.      Plaintiff Donald Koester ("Koester") is a citizen and resident of Memphis, Shelby County, Tennessee.  At all times relevant hereto, Koester owned a home located at 2539 Inverary Drive, Memphis, Tennessee (the "Koester Home").

2.      Plaintiff John Chase ("Chase") is a citizen and resident of Rocky Top, Anderson County, Tennessee.  At all times relevant hereto, Chase owned a home located at 310 Strong Hollow Lane, Rocky Top, Tennessee (the "Chase Home").

3.      Plaintiff Earnest Lee ("Lee") is a citizen and resident of Clarksdale, Coahoma County, Mississippi.  At all times relevant hereto, Lee owned a home located at 10644 Highway 322 East Belleview Road, Clarksdale, Mississippi (the "Lee Home").

4.      Plaintiff Charles McCaleb a/k/a/ Charles Smith ("Smith") is a citizen and resident of Saucier, Harrison County, Mississippi.  At all times relevant hereto, Smith owned a home located at 12997 Vogle Road, Saucier, Mississippi (the "Smith Home").

5.      Defendant USAA General Indemnity Company ("UGIC") is organized under the laws of the State of Texas and headquartered in San Antonio, Texas. UGIC is authorized to sell property insurance policies in the State of Mississippi and the State of Tennessee and is engaged in the insurance business in the State of Tennessee, including Shelby County.

6.      Defendant United Services Automobile Association ("USAA") is organized under the laws of the State of Texas and headquartered in San Antonio, Texas. USAA is authorized to sell property insurance policies in the State of Mississippi and the State of Tennessee and is engaged in the insurance business in the State of Tennessee, including Shelby County

7.      UGIC is a subsidiary of USAA, which owns and controls UGIC.

8.      UGIC and USAA (collectively, "Defendants") engaged in the challenged claims handling practice in a uniform manner and pursuant to a uniform policy.

9.      USAA operates a centralized adjustment operation in which its adjusters work on claims for multiple different entities, including both USAA and UGIC, using the same policies and procedures challenged in this case for adjusting insurance claims.

10.     The events giving rise to the individual claims asserted by Koester that are the subject of this action occurred in the Western Division of the Western District of Tennessee.

11.     On information and belief, this Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d) ("CAFA").

12.     This Court has personal jurisdiction over UGIC and USAA because they have availed themselves of the privilege of conducting business and issuing insurance contracts covering structures in the State of Tennessee.

## FACTS

### A.  The Koester Property Insurance Policy and Casualty Loss

13.     At all times relevant hereto, Koester was the insured pursuant to an insurance contract whereby UGIC agreed to insure, *inter alia,* the Koester Home against property damage, bearing Policy No. GIC03748341090A (the "Koester Policy").  As relevant hereto, the term of the Koester Policy was August 19, 2016 to August 29, 2017.

14.     A copy of the Koester Policy is attached hereto as Exhibit "1".

15.     The Koester Policy provided insurance coverage for direct physical loss to the buildings located on the insured premises, except as specifically excluded or limited by the Koester Policy.

16.     This lawsuit only concerns property insurance coverage for buildings, and *not* personal contents, such as clothes and furniture.

17.     Pursuant to the Koester Policy, Koester paid UGIC an annual premium in exchange for insurance coverage.  The required premiums were paid at all times relevant to this Complaint.

18.     On or about July 30, 2017, the Koester Home suffered a fire loss (the "Koester Loss").

19.     The Koester Policy was in effect at the time of the Koester Loss, and the Koester Loss is compensable under the terms of the Koester Policy.  As it relates to the Koester Loss, there is no applicable exclusion.

20.     Koester promptly notified UGIC of the Koester Loss and made a claim against the Koester Policy.

21.     After its inspection, UGIC determined that the Koester Loss was covered by the terms of the Koester Policy.

22.     For the Koester Home, UGIC calculated its actual cash value ("ACV") payment obligation to Koester by first estimating the cost to repair or replace the damage with new materials (replacement cost value, or "RCV"), then subtracted depreciation.

23.     The Koester Policy defines ACV as "the amount it would cost to repair or replace covered property, at the time of loss or damage, with material of like kind and quality, subject to a deduction for deterioration, depreciation and obsolescence."

**B.  UGIC's Calculation of Koester's ACV Payment**

24.     In adjusting Koester's claim, UGIC affirmatively and unilaterally chose to use a "replacement cost less depreciation" methodology to calculate the losses and make its ACV payment to Plaintiff.

25.     UGIC did not calculate any portion of Koester's casualty loss by reference to or analysis of the alleged increases or decreases in the market value of his property, or the market value of any portion of his property.  UGIC did not conduct an appraisal of the market value of any portion of Koester's property.

26.     UGIC has waived, and is estopped from asserting, any right to contend that ACV should have been calculated under any methodology other than the methodology actually used by UGIC, specifically including any market value methodology.

27.     UGIC used commercially-available computer software to make its RCV, depreciation and ACV calculations.

28.     UGIC calculated the RCV of Koester's damaged property at $253,724.17.

29.     UGIC then calculated the depreciation for Koester's damaged property at $81,732.45 and, after subtracting the $1,000.00 deductible, issued Koester an ACV payment in the amount of $169,159.58.

30.     Copies of UGIC's calculation for Koester is attached as Exhibit "2".

31.     Koester was underpaid, and deprived of the use of his money from the time he should have received it until the date he was belatedly paid, on his ACV claim as more fully described below.

**C.  The Chase Property Insurance Policy and Casualty Loss**

32.     At all times relevant hereto, Chase was the insured pursuant to an insurance contract whereby UGIC agreed to insure, *inter alia,* the Chase Home against property damage, bearing Policy No. GIC02879351490A (the "Chase Policy").  As relevant hereto, the term of the Chase Policy was June 23, 2017 to June 23, 2018.

33.     A copy of the Chase Policy is attached hereto as Exhibit "3".

34.     The Chase Policy provided insurance coverage for direct physical loss to the buildings located on the insured premises, except as specifically excluded or limited by the Chase Policy.

35.     This lawsuit only concerns property insurance coverage for buildings, and *not* personal contents, such as clothes and furniture.

36.     Pursuant to the Chase Policy, Chase paid UGIC an annual premium in exchange for insurance coverage.  The required premiums were paid at all times relevant to this pleading.

37.     On or about July 20, 2017, the Chase Home suffered a fire loss (the "Chase Loss").

38.     The Chase Policy was in effect at the time of the Chase Loss, and the Chase Loss is compensable under the terms of the Chase Policy.  As it relates to the Chase Loss, there is no applicable exclusion.

39.     Chase promptly notified UGIC of the Chase Loss and made a claim against the Chase Policy.

40.     After its inspection, UGIC determined that the Chase Loss was covered by the terms of the Chase Policy.

41.     For the Chase Home, UGIC calculated its ACV payment obligation to Chase by first estimating the cost to repair or replace the damage with new materials (RCV), then subtracted depreciation.

42.     The Chase Policy defines ACV as "the amount it would cost to repair or replace covered property, at the time of loss or damage, with material of like kind and quality, subject to a deduction for deterioration, depreciation and obsolescence."

**D.  UGIC's Calculation of Chase's ACV Payment**

43.     In adjusting Chase's claim, UGIC affirmatively and unilaterally chose to use a "replacement cost less depreciation" methodology to calculate the losses and make its ACV payment to Plaintiff.

44.     UGIC did not calculate any portion of Chase's casualty loss by reference to or analysis of the alleged increases or decreases in the market value of his property, or the market value of any portion of his property.  UGIC did not conduct an appraisal of the market value of any portion of Chase's property.

45.     UGIC has waived, and is estopped from asserting, any right to contend that ACV should have been calculated under any methodology other than the methodology actually used by UGIC, specifically including any market value methodology.

46.     UGIC used commercially-available computer software to make its RCV, depreciation and ACV calculations.

47.     UGIC calculated the RCV of Chase's damaged property at $116,967.64.

48.     UGIC then calculated the depreciation for Chase's damaged property at $29,680.14 and, after subtracting the $1,000.00 deductible, issued Chase an ACV payment in the amount of $86,287.50.

49.     A copy of UGIC's calculation for Chase is attached as Exhibit "4".

50.     Chase was underpaid on his ACV claim as more fully described below.

**E.  The Lee Property Insurance Policy and Casualty Loss**

51.     At all times relevant hereto, Lee was the insured pursuant to an insurance contract whereby USAA agreed to insure, *inter alia,* the Lee Home against property damage, bearing Policy No. USAA01469618092A (the "Lee Policy").  As relevant hereto, the term of the Lee Policy was January 6, 2017 to January 6, 2018.

52.     A copy of the declarations page of the Lee Policy is attached hereto as Exhibit "5".

53.     The Lee Policy provided insurance coverage for direct physical loss to the buildings located on the insured premises, except as specifically excluded or limited by the Lee Policy.

54.     This lawsuit only concerns property insurance coverage for buildings, and *not* personal contents, such as clothes and furniture.

55.     Pursuant to the Lee Policy, Lee paid USAA an annual premium in exchange for insurance coverage.  The required premiums were paid at all times relevant to this pleading.

56.     On or about February 20, 2017, the Lee Home suffered a fire loss (the "Lee Loss").

57.     The Lee Policy was in effect at the time of the Lee Loss, and the Lee Loss is compensable under the terms of the Lee Policy.  As it relates to the Lee Loss, there is no applicable exclusion.

58.     Lee promptly notified USAA of the Lee Loss and made a claim against the Lee Policy.

59.     After its inspection, USAA determined that the Lee Loss was covered by the terms of the Lee Policy.

60.     For the Lee Home, USAA calculated its ACV payment obligation to Lee by first estimating the cost to repair or replace the damage with new materials (RCV), then subtracted depreciation.

61.     The Lee Policy defines ACV as "the amount it would cost to repair or replace covered property, at the time of loss or damage, with material of like kind and quality, subject to a deduction for deterioration, depreciation and obsolescence."

**F.  USAA's Calculation of Lee's ACV Payment**

62.     In adjusting Lee's claim, USAA affirmatively and unilaterally chose to use a "replacement cost less depreciation" methodology to calculate the losses and make its ACV payment to Plaintiff.

63.     USAA did not calculate any portion of Lee's casualty loss by reference to or analysis of the alleged increases or decreases in the market value of his property, or the market value of any portion of his property.  USAA did not conduct an appraisal of the market value of any portion of Lee's property.

64.     USAA has waived, and is estopped from asserting, any right to contend that ACV should have been calculated under any methodology other than the methodology actually used by USAA, specifically including any market value methodology.

65.     USAA used commercially-available computer software to make its RCV, depreciation and ACV calculations.

66.     USAA calculated the RCV of Lee's damaged property at $172,856.84.

67.     USAA then calculated the depreciation for Lee's damaged property at $40,755.39 and, after subtracting the $1,000.00 deductible, issued Lee an ACV payment in the amount of $131,101.45.

68.     A copy of USAA's calculation for Lee is attached as Exhibit "6".

69.     Lee was underpaid on his ACV claim as more fully described below.

**G.  The Smith Property Insurance Policy and Casualty Loss**

70.     At all times relevant hereto, Smith was the insured pursuant to an insurance contract whereby UGIC agreed to insure, *inter alia,* the Smith Home against property damage, bearing Policy No. GIC04148878490A (the "Smith Policy").  As relevant hereto, the term of the Smith Policy was October 26, 2017 to October 26, 2018.

71.     A copy of the Smith Policy is attached hereto as Exhibit "7".

72.     The Smith Policy provided insurance coverage for direct physical loss to the buildings located on the insured premises, except as specifically excluded or limited by the Smith Policy.

73.     This lawsuit only concerns property insurance coverage for buildings, and *not* personal contents, such as clothes and furniture.

74.     Pursuant to the Smith Policy, Smith paid UGIC an annual premium in exchange for insurance coverage.  The required premiums were paid at all times relevant to this pleading.

75.     On or about December 24, 2017, the Smith Home suffered a fire loss (the "Smith Loss").

76.     The Smith Policy was in effect at the time of the Smith Loss, and the Smith Loss is compensable under the terms of the Smith Policy.  As it relates to the Smith Loss, there is no applicable exclusion.

77.     Smith promptly notified UGIC of the Smith Loss and made a claim against the Smith Policy.

78.     After its inspection, UGIC determined that the Smith Loss was covered by the terms of the Smith Policy.

79.     For the Smith Home, UGIC calculated its ACV payment obligation to Smith by first estimating the cost to repair or replace the damage with new materials (RCV), then subtracted depreciation.

80.     The Smith Policy defines ACV as "the amount it would cost to repair or replace covered property, at the time of loss or damage, with material of like kind and quality, subject to a deduction for deterioration, depreciation and obsolescence."  This definition is identical in the Koester, Chase, Lee, and Smith Policies.

**H.  UGIC's Calculation of Smith's ACV Payment**

81.     In adjusting Smith's claim, UGIC affirmatively and unilaterally chose to use a "replacement cost less depreciation" methodology to calculate the losses and make its ACV payment to Plaintiff.

82.     UGIC did not calculate any portion of Smith's casualty loss by reference to or analysis of the alleged increases or decreases in the market value of his property, or the market value of any portion of his property.  UGIC did not conduct an appraisal of the market value of any portion of Smith's property.

83.     UGIC has waived, and is estopped from asserting, any right to contend that ACV should have been calculated under any methodology other than the methodology actually used by UGIC, specifically including any market value methodology.

84.     UGIC used commercially-available computer software to make its RCV, depreciation and ACV calculations.

85.     UGIC calculated the RCV of Smith's damaged property at $9,563.36.

86.     UGIC then calculated the depreciation for Smith's damaged property at $1,589.15 and, after subtracting the $1,000.00 deductible, issued Smith an ACV payment in the amount of $8,563.36.

87.     A copy of UGIC's calculation for Smith is attached as Exhibit "8".

88.     Smith was underpaid on his ACV claim as more fully described below.

**I.   Defendants' Practice of Depreciating Labor**

89.     In this pleading, whenever reference is made to depreciating "labor," "labor" means intangible non-materials, specifically including both the labor costs and the laborers' equipment costs necessary to restore a policyholder's property to its condition immediately prior to a loss, as

well as "removal" costs to remove damaged property, under the claims estimating software program described below.

90.     When calculating Plaintiffs' ACV benefits owed under the respective policies, Defendants withheld the costs of labor necessary to repair or replace Plaintiffs' properties, even though labor does not depreciate in value over time. Defendants depreciated costs associated with non-materials, *i.e.*, labor, throughout its ACV calculations.

91.     Defendants' withholding of labor costs associated with the repair or replacement of Plaintiffs' properties resulted in Plaintiffs receiving payment for their losses in an amount less than Plaintiffs were entitled to receive under their policies. Defendants breached their obligations under the policies by improperly depreciating the cost of labor and other non-materials when calculating its ACV payment obligations.  Further, to the extent Defendants belatedly repaid previously withheld labor as depreciation, such as for Plaintiff Koester, Koester has also been damaged by the lost time value of money.

92.     Plaintiffs cannot determine the precise amount of labor that has been withheld as depreciation based upon the written estimates provided by Defendants.

93.     Plaintiffs concede that finished goods and construction materials can diminish in value over time due to use, wear, obsolescence, and age. Therefore, finished goods and construction materials depreciate. In contrast, both removal labor and installation labor are not susceptible to aging or wear. Their value does not diminish over time. Conceptually, practically, and under common understanding, depreciation cannot be applied to labor to remove damaged property or repair damaged property in the context of indemnification insurance.

94.     Labor, by its nature, does not depreciate, and an insurer therefore may not "depreciate" labor.  For example, materials used in the repair or replacement of a roof (roofing

shingles) diminish in value over time due to the wear that age and use inflict on them.  In contrast, prospective removal and repair labor is not susceptible to aging or wear, it does not lose value over time, and there is no depreciable life of labor. Labor's value does not diminish over time; only the materials depreciate.

95.     Defendants' practice of withholding labor costs as depreciation is inconsistent with the universally accepted premise that the fundamental purpose of property insurance is to provide indemnity to policyholders. To indemnify means to put the insured back in the position he or she enjoyed before the loss—no better and no worse. A policy, like Defendants' policies, that provides for payment of the ACV of a covered loss is an indemnity contract because the purpose of an ACV payment is to make the insured whole after the loss that occurred.

96.     While an insurer may lawfully depreciate material costs when calculating the amount of an ACV payment owed to an insured, it may not lawfully withhold removal and repair labor as depreciation.  Defendants' failure to pay the full cost of the labor necessary to return Plaintiffs back to their pre-loss condition left Plaintiffs under-indemnified and underpaid for their losses.

97.     Defendants materially breached their duty to indemnify Plaintiffs by withholding labor costs (and/or delaying payment in breach of the policies) associated with repairing or replacing Plaintiffs' property in their ACV payments, thereby paying Plaintiffs less than they were entitled to receive under the terms of the policies, and / or making untimely payments in breach of the contract.

**J.   The Length Of The Putative Class Period**

98.     The maximum length of the putative class period is dependent upon *inter alia* the accrual of the causes of action for breach of contract, including but not limited to inherent discoverability of the breach.

99.     In addition, any affirmative defenses that may be plead seeking to limit the length of the putative class period are subject to judicial doctrines concerning the accrual of the putative class members' claim and the concealment of the same by Defendants.

100.    Defendants concealed their practice of withholding labor as depreciation from both state regulators and putative class members.

101.    Specifically, as it relates to Tennessee regulators, in 2008, the National Association of Insurance Commissioners ("NAIC survey") published a copyrighted survey of state insurance departments and their respective positions on the depreciation of labor.   The Tennessee Department of Insurance ("TDOI") formally responded to the survey.

102.    As a prominent national property insurers that do a significant amount of business in Tennessee, Defendants knew or should have known of the existence of the NAIC survey and the TDOI's responses to the same.

103.    First, the NAIC survey asked Tennessee regulators "Does your state allow the depreciation of labor under an actual cash value (ACV) loss settlement provision for property?" The TDOI stated in response: "It is generally the belief that labor is not depreciable, but the Department has no written position on the matter.  We believe there is some case law supporting this aspect.  To our knowledge, this is not a problem here."

104.    Second, the survey also asked Tennessee regulators "Is depreciation for labor allowed on an ACV roof if it is totally replaced?"  The TDOI stated in response: "We do not

believe insurers are depreciating labor unless their provision calls for it.  At least one insurer has a policy provision addressing this issue."

105.    By at least 2008 then, Defendants were aware of or should have been aware that the TDOI took a position against the depreciation of labor based upon the NAIC 2008 survey, and that the TDOI believed that insurers were not engaging in the practice within the State of Tennessee unless their policy language called for labor depreciation.

106.    At all times relevant hereto, Defendants' insurance policies neither addressed nor called for removal or repair labor to be withheld as depreciation.  Similarly, Defendants' marketing materials did not address this practice, and consumers were not told of this practice when purchasing Defendants' property insurance products.  Defendants never notified the TDOI that its understandings as set forth in the NAIC survey were incorrect, and that Defendants were in fact withholding labor within the State of Tennessee and elsewhere under property policies that did not call for that practice.

107.    Additionally, the Mississippi Insurance Commissioner issued a bulletin on August 4, 2017, which stated:

**MISSISSIPPI INSURANCE DEPARTMENT**
**BULLETIN 2017-8**

**DEPRECIATION OF LABOR EXPENSES IN PROPERTY LOSS CLAIMS**

It is the purpose of this Bulletin to provide the position of the Mississippi Insurance Department regarding the depreciation of labor expenses by an insurer in the adjustment of property loss claims.

There is no statutory law in Mississippi prohibiting the practice of labor depreciation in the adjustment of property loss claims.  If such a practice is used, the insurer should clearly provide for the depreciation of labor in the insurance policy.  Likewise, if material and/or labor depreciation is applied, the insurer should clearly set out any such depreciation on the claim estimate furnished by the insurer.

This Bulletin shall not apply to automobile physical damage claims.

**ISSUED** this the 4th day of August, 2017.



MIKE CHANEY
COMMISSIONER OF INSURANCE

108.    Despite this directive from Mississippi's highest-ranking insurance regulator, Defendants continued to withhold labor from actual cash value payments as depreciation without any disclosure of same in their policies or on the claim estimates provided to policyholders.  For example, the Smith Loss occurred several months after Commissioner Chaney's August 2017 bulletin, but yet UGIC depreciated labor in its estimate of the Smith Loss without "clearly set[ting] out any such depreciation on the estimate" and without "clearly provid[ing] for the depreciation of labor in the [Smith Policy]."

109.    To further conceal its practice of withholding labor as depreciation, and to avoid any disputes with regulators and policyholders who made claims, Defendants unfairly used their claim estimating software to conceal its practice from policyholders.

16

110.     Like most property insurers, Defendants used a product called Xactimate to determine the amount of depreciation to apply to a claim.  Xactimate is used by both insurers and contractors to calculate the cost of rebuilding or repairing damaged property.  Xactimate uses "line item" pricing to determine repair costs.

111.     For all line items, Xactimate allows an insurer to depreciate labor by toggling on or off depreciation settings called "depreciate removal" and "depreciation non-material."  If both of these settings are toggled on, then all line items will show the withholding of labor as depreciation.

112.      Defendants affirmatively hid their use of these two labor depreciation settings in Xactimate from both policyholder claimants and insurance regulators, if any, that may have investigated the same, by not depreciating "pure labor line items" that would obviously reflect the withholding of labor.

113.     For example, in Ex. "2", UGIC did not depreciate the removal labor associated with the pure labor line item "Demolish/remove – bedroom/room."  This would lead a regulator or policyholder to believe that UGIC was not depreciating any labor.  However, in other line items in the estimate, UGIC did use the depreciation setting to withhold labor when the line item reflected the mixed use of materials and labor.

114.     In other words, UGIC only withheld labor from line items in estimates provided to policyholders where the policyholder could not detect the practice of withholding labor as depreciation.  UGIC did not make a principled decision to depreciate labor for Plaintiffs claim, but rather UGIC only depreciated labor in line items where it would be difficult if not impossible to detect the practice.

115.    As a result, Defendants purposely intended to prevent an ordinary consumer or insurance regulator to know that Defendants depreciated labor, and not merely materials, when making ACV payments to policyholders.

116.    At all times relevant hereto, Defendants were under an affirmative duty to fairly disclose the manner in which it calculated ACV payments to policyholders. In addition, when providing estimates to Plaintiffs and similarly situated policyholders, Defendants were under a duty to be truthful, and to not deceive by omission.

117.    Defendants were in a superior position over policyholders to know that they were depreciating labor through Xactimate. Defendants' policyholders are not sophisticated in insurance claims handling procedures like Defendants.  In addition, Defendants controlled the settings for the software, which expressly permit a company to properly limit depreciation to materials only.  Moreover, policyholders do not have access to Defendants' software to determine whether it was used to depreciate labor costs.  Without such access, and due to Defendants' affirmative steps taken to conceal their depreciation of labor costs, Defendants' policyholders lacked the same access to information enjoyed by Defendants and could not determine that Defendants were depreciating labor costs.

118.    The practice was therefore not disclosed in the insurance policy, in the claim estimate, in the marketing materials, nor in the e regulatory filings of Defendants.  The affirmative steps Defendants took to conceal the cause of action for breach of the insurance contract were material facts that a reasonable person would have considered important in deciding whether to purchase insurance and/or accept ACV payments from Defendants.

119.    Defendants' depreciation of labor costs was inherently undiscoverable by its very nature by its policyholders and thus Defendants' policyholders would not be—and in fact were

not—aware that Defendants depreciated labor costs when calculating ACV despite policyholders' due diligence.  Defendants are solely at fault for their policyholders' lack of knowledge about Defendants' depreciation of labor costs.

120.    Defendants have made false statements suggesting that they stopped withholding labor as depreciation from ACV payments since 2015 pursuant to their own property handling guidelines.   These statements are false, as Defendants have continued to withhold labor as depreciation from ACV payments of Tennessee and Mississippi policyholders.

121.    The concealment of information in estimates and other statements was performed by Defendants with the intent that policyholders believed that only materials were being depreciated when receiving ACV claim payments, and that policyholders would not know that their claim payments were actually diminished by the withholding of repair labor through the unfair manipulation of the Xactimate software and that policyholders would not contest the concealed practice in court or through regulatory action.

## AMOUNT IN CONTROVERSY

122.    Upon information and belief, the amount in controversy with respect to the proposed class exceeds $5,000,000, exclusive of interest and costs.

## CLASS ACTION ALLEGATIONS

123.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this lawsuit as a class action on behalf of themselves and on behalf of all others similarly situated. This action satisfies the requirements of numerosity, commonality, typicality, and adequacy of

representation.   Only to the extent it is a requirement under applicable law, the class is ascertainable.

124.     The proposed class that Plaintiffs seek to represent is defined as follows:

> All USAA and UGIC policyholders under any property policies issued by USAA and/or UGIC who made: (1) a structural damage claim for property located in the States of Tennessee or Mississippi; and (2) which resulted in an actual cash value payment from which "non-material depreciation" was withheld from the policyholder; or which should have resulted in an actual cash value payment but for the withholding of "non-material depreciation" causing the loss to drop below the applicable deductible.
>
> In this definition, "non-material depreciation" means application of either the "depreciate removal," "depreciate non-material" and/or "depreciate O&P" option settings within Xactimate software.
>
> The class period for the proposed class is the maximum time period as allowed by applicable law.
>
> The class excludes all claims arising under policy forms expressly permitting the "depreciation" of "labor" within the text of the policy form and any claims in which the actual cash value payments exhausted the applicable limits of insurance

125.     Plaintiffs reserve the right to amend the definition of the proposed class. The following persons are expressly excluded from the Class: (1) Defendants and their subsidiaries and affiliates; (2) all persons who make a timely election to be excluded from the proposed Class; and (3) the Court to which this case is assigned and its staff.

126.     Plaintiffs and members of the putative class as defined all have Article III standing as all such persons and entities, at least initially, received lower claim payments than permitted under the policy.  Certain amounts initially withheld as depreciated labor may be later repaid to policyholders (such as Plaintiff Koester) upon further adjustment of the claim.  However, policyholders including Plaintiff Koester who have been subsequently repaid in whole or in part for initially withheld labor depreciation still have incurred damages, at the least, in the form of the

lost "time value" of money during the period of withholding, *i.e.*, interest on the amounts improperly withheld, for the time period of withholding.

127.     Specifically, under Tennessee and Mississippi state law, Plaintiffs and members of the putative class who have been wrongfully deprived of money by the withholding of labor from ACV payments have been damaged in two ways.  First, they have been damaged because they have not received the money to which they are entitled.  Second, they have been damaged because they have been deprived of the use of that money from the time they should have received it until it was or is paid in full.  In Tennessee and Mississippi, prejudgment interest compensates the wronged party for the loss of the use of the money he, she or it should have received earlier but for the breach of contract.

128.     The members of the proposed class are so numerous that joinder of all members is impracticable. Plaintiffs reasonably believe that hundreds or thousands of people geographically dispersed across Tennessee and Mississippi have been damaged by Defendants' actions.  The names and addresses of the members of the proposed class are readily identifiable through records maintained by Defendants or from information readily available to Defendants.

129.     The relatively small amounts of damage suffered by most members of the proposed class make filing separate lawsuits by individual members economically impracticable.

130.     Defendants have acted on grounds generally applicable to the proposed class in that Defendants have routinely depreciated labor costs in their adjustment of property damage claims under its policies of insurance.  It is reasonable to expect that Defendants will continue to withhold labor as depreciation to reduce the amount they pay to their insureds under these policies absent this lawsuit.

131.    Common questions of law and fact exist as to all members of the proposed class and predominate over any questions affecting only individual members. The questions of law and fact common to the proposed class include, but are not limited to:

   a.   Whether Defendants' policy language allows them to withhold labor as depreciation in its calculation of ACV payments;

   b.   Whether Defendants' policy language is ambiguous concerning the practice of withholding labor as depreciation when calculating ACV payments, and, if so, how Defendants' insurance policies should be interpreted;

   c.   Whether Defendants' withholding of labor as depreciation in their calculation of ACV payments breaches the insurance policies;

   d.   Whether Defendants have a custom and practice of withholding labor as depreciation in their calculation of ACV payments;

   e.   Whether Plaintiffs and members of the proposed class have been damaged as a result of Defendants' withholding of labor as depreciation in their calculation of ACV payments;

   f.   Whether Plaintiffs and members of the proposed class are entitled to a declaration, as well as potential supplemental relief, under the Declaratory Judgment Act; and

   g.   Whether Plaintiffs and members of the proposed class are entitled to equitable relief in the form of specific performance, unjust enrichment, declaratory relief or restitutionary damages.

132.    Plaintiffs' claims are typical of the claims of all proposed class members, as they are all similarly affected by Defendants' custom and practice concerning withholding labor as depreciation. Further, Plaintiffs' claims are typical of the claims of all proposed class members because their claims arise from the same practices and course of conduct that give rise to the claims of the class members and are based on the same factual and legal theories.  Plaintiffs are not different in any material respect from any other member of the proposed class.

133.    Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the proposed class. Plaintiffs' interests do not conflict with the interests of the

proposed class they seek to represent. Plaintiffs have retained lawyers who are competent and experienced in class action and insurance litigation. Plaintiffs and Plaintiffs' counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class members and will diligently discharge those duties by vigorously seeking the maximum possible recovery for the Class while recognizing the risks associated with litigation.

134.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Joining all proposed class members in one action is impracticable and prosecuting individual actions is not feasible. The size of the individual claims is likely not large enough to justify filing a separate action for each claim. For many, if not most, members of the proposed class, a class action is the only procedural mechanism that will afford them an opportunity for legal redress and justice. Even if proposed class members had the resources to pursue individual litigation, that method would be unduly burdensome to the courts in which such cases would proceed. Individual litigation exacerbates the delay and increases the expense for all parties, as well as the court system. Individual litigation could result in inconsistent adjudications of common issues of law and fact.

135.    In contrast, a class action will minimize case management difficulties and provide multiple benefits to the litigating parties, including efficiency, economy of scale, unitary adjudication with consistent results and equal protection of the rights of Plaintiffs and members of the proposed class. These benefits would result from the comprehensive and efficient supervision of the litigation by a single court.

136.    Questions of law or fact common to Plaintiffs and the proposed class members, including those identified above, predominate over questions affecting only individual members

(if any), and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Class action treatment will allow a large number of similarly situated consumers to prosecute their common claims in a single forum, simultaneously, efficiently, and without the necessary duplication of effort and expense that numerous individuals would require. Further, the monetary amounts due to many individual proposed class members are likely to be relatively small, and the burden and expense of individual litigation would make it difficult or impossible for individual proposed class members to seek and obtain relief.  On the other hand, a class action will serve important public interests by permitting consumers harmed by Defendants' unlawful practices to effectively pursue recovery of the sums owed to them, and by deterring further unlawful conduct.  The public interest in protecting the rights of consumers favors disposition of the controversy in the class action form.

137.    Class certification is further warranted because Defendants have acted or refused to act on grounds that apply generally to the class, so final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.  Plaintiffs may seek, in the alternative, certification of an issues class under Fed. R. Civ. P. 23(c)(4).

## COUNT I
## BREACH OF CONTRACT

138.    Plaintiffs restate and incorporate by reference all preceding allegations.

139.    Defendants entered into policies of insurance with Plaintiffs and members of the proposed class. These insurance policies govern the relationship between Defendants, Plaintiffs and members of the proposed class, as well as the manner in which claims for covered losses are handled.

140.     The policies of insurance between Defendants and Plaintiffs and the other proposed class members are binding contracts under Tennessee and Mississippi law, supported by valid consideration in the form of premium payments in exchange for insurance coverage.

141.     Defendants drafted the insurance policies at issue, which are essentially identical in all respects material to this litigation.

142.     In order to receive ACV claim payments, Plaintiffs complied with all material provisions and performed all of their respective duties with regard to their insurance policies.

143.     The policies of insurance Defendants issued to Plaintiffs and members of the proposed class state that, in the event of a loss, Defendants may fulfill their full or initial contractual obligation to an insured party by paying the ACV of the loss. At all times relevant hereto, Defendants' custom and practice has been, and is, to make such payments based upon Defendants' calculation of the ACV for the partial loss, less any applicable deductible.

144.     Defendants breached their contractual duty to pay Plaintiffs and members of the proposed class the ACV of their claims by unlawfully withholding labor as depreciation.

145.     Defendants' actions in breaching their contractual obligations to Plaintiffs and members of the proposed class benefitted and continue to benefit Defendants. Likewise, Defendants' actions damaged and continue to damage Plaintiffs and members of the proposed class.

146.     Defendants' s actions in breaching their contractual obligations, as described herein, are the direct and proximate cause of damages to Plaintiffs and members of the proposed class.

147.     In light of the foregoing, Plaintiffs and members of the proposed class are entitled to recover damages sufficient to make them whole for all amounts Defendants unlawfully withheld

or delayed from their ACV payments as labor cost depreciation, including unrecovered depreciated labor costs and interest on any withheld or delayed labor cost depreciation withholdings.

148.     Plaintiffs and members of the proposed class seek any and all relief as may be permitted under Tennessee and Mississippi law to remedy the ongoing breaches of contract.

## COUNT II
## DECLARATORY JUDGMENT AND RELIEF

149.     Plaintiffs restate and incorporate by reference all preceding allegations.

150.     This Court is empowered by the Declaratory Judgment Act as codified at 28 U.S.C. § 2201 and Fed. R. Civ. P. 57 to declare the rights and legal relations of parties regardless of whether or not further relief is or could be claimed.

151.     A party may seek to have insurance contracts, before or after a breach, construed to obtain a declaration of rights, status, and other legal relations thereunder adjudicated.

152.     Plaintiffs and members of the proposed class have complied with all relevant conditions precedent in their contracts.

153.     Plaintiffs seek, personally and on behalf of the proposed class, a declaration that Defendants' property insurance contracts prohibit the withholding of labor costs as depreciation when adjusting partial losses under the methodology employed here.

154.     Plaintiffs further seek, personally and on behalf of the proposed class, any and all equitable relief available under the law that the Court deems necessary and proper to the administration of justice, including, but not limited to, identifying and locating policyholders, and notifying the same of the circumstances complained of and the restoration of their rights and remediation of their losses, and preclusion by Defendants in engaging in the conduct described herein, as may be permitted by law.

155.     Plaintiffs and members of the proposed class have suffered injuries.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court:

1.      Enter an order certifying this action as a class action, appointing Plaintiffs Donald Koester,John Chase, Earnest Lee and Charles McCaleb a/k/a/ Charles Smith as the representatives of the class, and appointing Plaintiffs' attorneys as counsel for the class;

2.      Enter a declaratory judgment, declaring that Defendants' practice of withholding labor costs as depreciation is contrary to and breaches the insurance policies issued to Plaintiffs and members of the class;

3.      Enter a preliminary and permanent injunction and equitable relief against Defendants and their officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the policies, practices, customs, and usages complained of herein;

4.      Enter an order that Defendants specifically perform and carry out policies, practices, and programs that remediate and eradicate the effects of their past and present practices complained of herein;

5.       Award compensatory damages for all sums depreciated as labor costs under the policy, plus prejudgment interest on all such sums, to Plaintiffs and members of the class;

6.      Award costs, expenses, and disbursements incurred herein by Plaintiffs and members of the class;

7.      Pre- and Post-Judgment interest; and

8.    Grant such further and additional relief as the Court deems necessary and proper.

GILBERT McWHERTER
SCOTT BOBBITT PLC

By: _/s/_ _J.Brandon McWherter_____
J. BRANDON McWHERTER - #21600
341 Cool Springs Blvd, Suite 230
Franklin, TN  37067
(615) 354-1144
bmcwherter@gilbertfirm.com

CLINTON H. SCOTT - #23008
GILBERT McWHERTER SCOTT BOBBITT PLC
54 Exeter Road, Suite D
Jackson, TN 38305
(731) 664-1340
cscott@gilbertfirm.com

ERIK D. PETERSON (KY Bar 93003)*
MEHR, FAIRBANKS & PETERSON
 TRIAL LAWYERS, PLLC
201 West Short Street, Suite 800
Lexington, KY 40507
(859) 225-3731
edp@austinmehr.com

T. JOSEPH SNODGRASS (MN Bar 0231071)*
LARSON· KING, LLP
30 7th Street E., Suite 800
St. Paul, MN 55101
(651) 312-6510
jsnodgrass@larsonking.com

*Attorneys for Plaintiffs and*
*Proposed Class Representatives*

***admitted pro hac vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Second Amended Complaint was filed and served via the Court's ECF filing system which will send electronic notices of same to all counsel of record on this the 21st day of August, 2019.

George ("Buck") Lewis
Nicole D. Berkowitz
Baker Donelson
First Tennessee Building
165 Madison Avenue
Memphis, TN 38103

Mark A. Johnson
Rodger Eckelberry
Marissa A. Peirsol
Baker & Hostetler LLP
200 Civic Center Drive, Suite 1200
Columbus, OH 43215

_/s/  J.Brandon McWherter_____